Filed 5/3/23  P. v. Lopez CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>  v.<br><br>JOSUE VERDUGO LOPEZ,<br><br>      Defendant and Appellant. | C096152<br><br>(Super. Ct. No. STKCRFE20200011521) |

Defendant Josue Verdugo Lopez stabbed his neighbor to death in the victim's apartment.  Found guilty of first degree murder with a knife and burglary, defendant received 25 years to life in state prison for the murder, plus one year for a weapon enhancement, and a stayed upper term sentence for the burglary.

On appeal, defendant contends the prosecutor engaged in prejudicial misconduct during closing argument by asserting that there was no evidence defendant had used drugs the day of the homicide and that the jury could not consider testimony regarding defendant's drug usage to infer he had been using drugs when he killed the victim, which he asserts misstated the evidence and the law regarding circumstantial evidence.  To the extent he forfeited his prosecutorial misconduct claims by not objecting and asking for an

1

admonition below, defendant argues his counsel was ineffective. He also seeks credit for one additional day of presentence custody.

We agree defendant is entitled to an additional day of credit, but otherwise reject his claims. By not objecting, defendant forfeited his prosecutorial misconduct challenge, and he has not shown counsel was ineffective or that he was prejudiced by any alleged error. We therefore modify the judgment to award defendant one additional day of custody credit and affirm.

## I. BACKGROUND

On the evening of October 20, 2020, D.B. walked outside his garage in his apartment complex and waved to his neighbor, Dennis Ferguson. Sometime later, someone told D.B. that Ferguson was arguing with another neighbor. D.B. walked to Ferguson's apartment and looked through his window. D.B. saw Ferguson lying on the ground bleeding; Ferguson's apartment door was open. D.B. called 911 and started CPR.

Shortly before police responded to the scene, another neighbor, N.C., saw defendant walking shirtless through the apartment complex while putting on a pair of pants. N.C. stepped inside her garage where her husband was working, and she shut and locked the door because she was scared. Defendant stopped at the door and asked for help, but they did not respond.[1] Her husband believed that defendant appeared nervous; he was shirtless and glanced side to side like he was trying to hide from someone. After they heard sirens, they saw defendant leave and run across the street. Clothing and personal items belonging to defendant or his family were found discarded near the couple's apartment.

Stockton police officers responded to a reported stabbing at the apartment complex around 7:00 p.m. They found Ferguson lying unconscious on his apartment

---

[1] N.C.'s husband did not recall telling officers that defendant had asked for help.

2

floor with multiple stab wounds as D.B. performed CPR. Ferguson was transported to a hospital where he died from his injuries.

Later that night, officers searched a neighboring apartment where defendant and his partner, Y.C., lived with their children. Inside, officers located a backpack belonging to defendant's minor daughter with some of defendant's clothing in it, including defendant's shoes and black sweatpants with red stains on them that appeared to be blood. The backpack also contained a white shirt and a large kitchen knife, which both had red substances on them that appeared to be blood. Police found a pair of jeans with a wet spot and discoloration in the bathroom trash can. An electric blow dryer was on in the bathroom sink.

On the day Ferguson was killed, Y.C. saw defendant at their apartment before she left for her 3:00 p.m. shift at a restaurant located a short distance away. Defendant was wearing a short-sleeved white shirt and black pants, which did not have any red marks or stains on them when Y.C. left.

Towards the end of Y.C.'s shift that day, Y.C. saw a man attempting to open her car door outside the restaurant. She could not tell whether it was defendant. The man was unable to open the car door and ran off towards the street. Y.C. left the restaurant when her shift ended around 10:00 or 10:30 p.m.

As Y.C. drove home,[2] she thought she saw defendant running shirtless across the street. He appeared to be carrying one of their kitchen knives in his hand.

Y.C. stopped the car to confirm it was defendant, but she was scared because she thought defendant might be under the influence of drugs. Over the previous month, Y.C. had often seen defendant when he had used drugs; he would become angry and accuse her of being unfaithful. Fearful, Y.C. drove off as defendant approached her car.

---

[2] Y.C. had taken two of her children to work with her that day, and they were also in the car.

When she arrived at the apartment complex a short time later, Y.C. found police investigating the murder scene; her apartment was blocked off. She informed officers that she had just seen defendant nearby with their kitchen knife.

Around 10:50 p.m., officers located defendant walking towards a nearby business wearing black pants but no shirt; he was carrying a pair of pliers. Defendant was arrested after following commands given to him in Spanish.

At the police station, a detective observed defendant rolling around on the ground in the interview room, moving his body in various directions. During the lengthy police interview, defendant was sometimes highly active or sleeping on the floor. The detective could not say, based on his training and experience, whether defendant seemed like he was high on drugs at the time; his behavior sometimes appeared normal throughout the long interview process.

Subsequent DNA analysis revealed that the red stains on the shoes, knife, and white shirt found in defendant's daughter's backpack was human blood. Further analysis indicated that Ferguson was a likely contributor to the blood found on the heel of defendant's right shoe, the bloodstain on the side of the knife and the knife handle, and the bloodstain on the white shirt. There was also a strong likelihood that defendant contributed to the bloodstain on the knife handle and to the bloodstain on the white shirt.

A jury found defendant guilty of willful, deliberate, premeditated murder (Pen. Code, §§ 187, subd. (a), 189—count 1)[3] while using a knife (§ 12022, subd. (b)(1)), and first degree burglary (§ 459—count 2). In April 2022, the trial court sentenced defendant to an indeterminate term of 25 years to life for the murder, plus a consecutive one year for the weapon enhancement. The court imposed the upper term of six years for the burglary offense, which it stayed under section 654. In imposing the upper term, the

---

[3] Further undesignated statutory references are to the Penal Code.

court cited several factors in aggravation, including that Ferguson was vulnerable in his home with some health issues when he was killed, that defendant engaged in violent behavior, that defendant suffered a prior felony sex offense conviction, and that defendant had expressed no remorse or regret for the crimes. The court awarded defendant 552 days of presentence custody credits. Defendant timely appealed.

## II. DISCUSSION

### A.    *Prosecutorial Misconduct*

Defendant contends the prosecutor's closing argument misrepresented the evidence concerning the primary defense of intoxication and misstated the law regarding circumstantial evidence. These alleged prosecutorial errors, he contends, mandate reversal for a new trial. We disagree.

#### 1.    *Closing Arguments*

Before closing arguments commenced, the trial court cautioned the jury that if either side objected that the other's argument somehow misstated the evidence, jurors could request a readback from the court reporter during deliberation to confirm the evidence for themselves. The court noted that the attorneys were merely advocates and reminded the jurors that different people could see or hear things differently.

At the outset of her closing argument, the prosecutor stated that it was the attorneys' opportunity to argue to the jury what they believed the evidence showed, and that it would "never be [her] intent to try to confuse [them] or to mislead [them]." To that end, the prosecutor encouraged the jurors to consult "the actual evidence" if they believed that the evidence showed something different than what she argued in closing, because "[a]t the end of the day, it doesn't matter what the attorneys say because as you will read in CALCRIM 200, attorneys are not evidence—what they say is not evidence."[4]

---

[4] CALCRIM No. 200 provides in pertinent part: "You must decide what the facts are. It is up to all of you, and you alone, to decide what happened, based only on the evidence

She further noted that the jury instruction packet would be the law that guided the jury, and she encouraged jurors to look to the law if they had any questions during deliberations.

The prosecutor acknowledged that this case was a "circumstantial evidence case" where the jury would use inferences to prove a fact since there was no eyewitness to the crime, and she referred jurors to the jury instructions concerning circumstantial evidence.

The prosecutor subsequently summarized Y.C.'s testimony as follows: "[A]lthough she never personally observed [defendant] using drugs, she believed that he would use drugs at times." The prosecutor continued, "[Y.C.] also described that she had found pipes within the house. We know nothing more. And you don't get to fill it in. All we know is that her further information was that when he would be coming from a different point during the course of using drugs, he would become angry, and he would be accusing her of engaging in infidelity. That's the evidence you have. You don't get to attach something any more than that because there's absolutely no evidence in this case that he was using drugs that day; how much drugs he was using that day; if he was, what that drug [] may have been; how he was affected by it, absolutely nothing. You have to stay within the confines of what you know. You don't get to fill it in. [¶] You don't get to make an excuse. You don't get to excuse someone because it's very convenient to just adopt something that would help you feel better about why he did this, but that's not what you're here for. So you're here to evaluate the facts. And at the end of the day what is reasonable in light of all of the evidence." Defense counsel did not object to this portion of the prosecutor's argument.

Next, the prosecutor noted the jury would have to decide whether the voluntary intoxication instruction applied based on the evidence presented. While she

that has been presented to you in this trial. [¶] . . . [¶] You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."

6

acknowledged that voluntary intoxication could negate the specific intent required for each count, she argued the jury would have to find that defendant was "under the influence of some narcotic of some sort to the extent that he could not have decided before he killed [Ferguson] that that's what he was going to do."

In arguing against finding voluntary intoxication, the prosecutor characterized defendant's actions before and after the murder as calculated, including using the knife from his own apartment to kill the victim in the victim's apartment and then returning to his own apartment to try to change, wash some of the blood off his clothes, and hide the bloody knife and bloody shoes in his child's backpack. The prosecutor argued that "[p]eople that do not understand the wrongfulness of what they just did, do not need to hide evidence, and they do not need to go and hide. That's how you know that he was not intoxicated to any extent that he did not understand what he was doing."

In her closing argument, defense counsel emphasized both the circumstantial evidence instruction and the voluntary intoxication instruction for the jury. She highlighted evidence showing defendant's prior drug use and his erratic behavior after Ferguson was murdered to circumstantially show he was voluntarily intoxicated the night of the murder thereby negating the required specific intent for the murder and burglary charges. Defense counsel also argued: "Now, the district attorney told you, well, that doesn't mean anything. Well, isn't that circumstantial evidence that he uses meth, just the same as she wants you to use circumstantial evidence to convict him of murder?"

In rebuttal, the prosecutor pointed out that there was no evidence that officers had found drug pipes in defendant's apartment, which would have seemed likely had defendant been a significant drug user as defense counsel argued. While she posited that maybe defendant used drugs, in her view, the relevant question before the jury was whether there was any evidence to support that defendant used drugs before he committed the murder and that, as a result, he lacked the capacity to understand that he was picking up the knife from his own apartment and taking it to Ferguson's apartment to

7

kill him.  She further argued that "when you look at all the actions that he took, hiding evidence, cleaning up evidence, changing his clothes, leaving, finding his way out to West Lane where [Y.C.] was located, knowing that's where she would be, if he was so zonked out of his mind on dope after he did this crime, what would you expect to see, him just standing there with a knife in his hand?  He would still be on scene.  He would not formulate all of this stuff."  In sum, the prosecutor asserted that "the mere fact that somebody says at some point . . . she doesn't see he uses drugs and then he acts out is not sufficient to prove that in this case he used it and he was high to an extent that he did not know what he was doing."

2.     *Analysis*

The standards for evaluating prosecutorial misconduct are well-established. (*People v. Hill* (1998) 17 Cal.4th 800, 819 (*Hill*).)  "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury."  (*People v. Morales* (2001) 25 Cal.4th 34, 44 (*Morales*).)

Generally, " 'a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant [requested] an assignment of misconduct and [also] requested that the jury be admonished to disregard the impropriety.' "  (*People v. Ochoa* (1998) 19 Cal.4th 353, 427.)  A defendant will be excused from making a timely objection or requesting an admonishment, however, if either would be futile.  (*Hill, supra*, 17 Cal.4th at p. 820.)

When a misconduct claim focuses on a prosecutor's remarks before the jury, "the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the

complained-of comments in an improper or erroneous manner.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 667 (*Centeno*); see *Morales, supra*, 25 Cal.4th at p. 44.) In reviewing the prosecutor's remarks, an appellate court does not lightly infer the jury drew the most damaging rather than the least damaging meaning from them. (*Centeno, supra*, at p. 667.)

Prosecutors, moreover, are " ' "given wide latitude" ' " during closing arguments (*Hill, supra,* 17 Cal.4th at p. 819), and they are entitled to discuss the evidence and to comment on reasonable inferences that may be drawn therefrom. (*Morales, supra*, 25 Cal.4th at p. 44.) Summations may be vigorous; a prosecutor is " ' " ' "not limited to 'Chesterfieldian politeness.' " ' " ' " (*Hill, supra*, at p. 819.) Nevertheless, while a prosecutor has broad discretion in discussing the legal and factual merits of a case, " ' "it is improper to misstate the law." ' " (*People v. Katzenberger* (2009) 178 Cal.App.4th 1260, 1266.)

Defendant concedes he failed to object to any of the prosecutor's closing statements he now alleges are improper. The alleged misconduct, we conclude, was not so egregious that a curative admonition would not have been effective. As the People note, even if the prosecutor's comments amounted to error, any prejudicial effect could have been cured by an instruction from the trial court clarifying how the jury was to apply the instructions concerning circumstantial evidence and voluntary intoxication. Accordingly, defendant has not preserved his misconduct claims for review.

Defendant argues that to the extent his counsel failed to object below and preserve the points for appeal, his counsel provided ineffective assistance. To establish a claim for ineffective assistance of counsel, defendant must show his counsel's performance was deficient and that he suffered prejudice as a result. (*People v. Mickel* (2016) 2 Cal.5th 181, 198; *Strickland v. Washington* (1984) 466 U.S. 668, 687-692.) To demonstrate prejudice, defendant must show a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. (*Mickel, supra*,

9

at p. 198.) We presume that "counsel's actions fall within the broad range of reasonableness, and [we] afford 'great deference to counsel's tactical decisions.' " (*Ibid.*)

As our Supreme Court has observed, "certain practical constraints make it more difficult to address ineffective assistance claims on direct appeal rather than in the context of a habeas corpus proceeding." (*People v. Mickel, supra*, 2 Cal.5th at p. 198.) This is because "[t]he record on appeal may not explain why counsel chose to act as he or she did. Under those circumstances, a reviewing court has no basis on which to determine whether counsel had a legitimate reason for making a particular decision, or whether counsel's actions or failure to take certain actions were objectively unreasonable." (*Ibid.*) We will reverse only if there is affirmative evidence that counsel had no rational tactical purpose for an act or omission. (*Ibid.*; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266 [if " ' "the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected' "].) A defendant thus bears a difficult burden when asserting an ineffective assistance claim on direct appeal. (*Mickel, supra*, at p. 198.)

The record here is silent as to counsel's reasons, if any, for failing to object to the prosecutor's closing remarks defendant now challenges on appeal. Defendant claims there was no reasonable tactical basis for trial counsel's failure to object to the alleged misrepresentations of the testimony concerning defendant's potential intoxication defense and the misstatement of the law regarding circumstantial evidence since the intoxication defense was the most viable defense available at trial. We disagree. Defendant has shown neither deficient performance nor prejudice.

It is well-settled that " 'a mere failure to object to evidence or argument seldom establishes counsel's incompetence' " (*People v. Wharton* (1991) 53 Cal.3d 522, 567), as " '[d]eciding whether to object is inherently tactical.' " (*People v. Salcido* (2008)

10

44 Cal.4th 93, 172; see *ibid.* [" 'the failure to object will rarely establish ineffective assistance' "].) Here, the record establishes that valid tactical reasons existed for not objecting to, and not asking the trial court to tell the jury to disregard, the prosecutor's arguments.

A prosecutor may comment on the state of the evidence (*Morales, supra*, 25 Cal.4th at p. 44), and may properly urge the jury to discount an accused's mitigating or defense evidence. (See e.g., *People v. Lucero* (2000) 23 Cal.4th 692, 735 [prosecutor's argument during penalty phase that the defendant's difficult childhood or military service did not give him a blank check to commit murder was proper; prosecutor did no more than urge the jury to discount the defendant's mitigating evidence].) "It is permissible to argue that the jury may reject impossible or unreasonable interpretations of the evidence and to so characterize a defense theory." (*Centeno, supra*, 60 Cal.4th at p. 672.)

In this case, defense counsel reasonably could have determined that the prosecutor's initial comments regarding defendant's alleged drug use based on Y.C.'s testimony did not misstate the law or the evidence concerning circumstantial evidence, but merely constituted a comment on the state of the evidence, or lack of evidence, regarding defendant's drug use the day of the killing and how that might have impacted his ability to form the specific intent necessary to support the charges. This is especially so since the complained-of comment came almost directly after the prosecutor acknowledged the case was a circumstantial one and referred the jury to the court's instructions on the issue. Counsel does not render ineffective assistance by failing to make objections that counsel reasonably determined are unmeritorious or futile. (*People v. Price* (1991) 1 Cal.4th 324, 387.) To the extent defendant faults the prosecutor for not characterizing evidence that defendant left tools or clothes outside his neighbor's apartment when he asked for help or that he left a hair dryer running in his apartment as circumstantial evidence of defendant's drug use the day he killed Ferguson, nothing required the prosecutor to adopt defense counsel's preferred interpretation of the

11

evidence. (*Centeno, supra*, 60 Cal.4th at p. 672.) Indeed, as defendant himself concedes, his intent in leaving items outside another apartment is unclear, and the prosecutor was free to argue a contrary interpretation to the jury.

Defense counsel also could have determined that tactically it was better to confront the argument head on during her closing, rather than simply object, which defendant concedes defense counsel did. As defendant notes, his trial counsel argued in response: "[T]he district attorney told you, well, that doesn't mean anything. Well, isn't that circumstantial evidence that he uses meth, just the same as she wants you to use circumstantial evidence to convict him of murder?" Counsel thus alerted the jury to the fact that circumstantial evidence of defendant's drug use was important to focus on in deciding the case. Because " '[t]he decision facing counsel in the midst of trial over whether to object to comments made by the prosecutor in closing argument is a highly tactical one[,]' " and rarely establishes ineffective assistance, we cannot say defense counsel's tactical choice to confront the argument rather than object was unreasonable under the circumstances. (*Centeno, supra*, 60 Cal.4th at p. 675; see *People v. Wharton, supra*, 53 Cal.3d at p. 567 [failure to object rarely establishes ineffective assistance of counsel because decision to object is inherently tactical].)

Furthermore, considered in the context of the prosecutor's entire closing argument, we do not believe the prosecutor's challenged remarks that the jury did not get to "fill-in" missing evidence misstated the law regarding circumstantial evidence or misrepresented the evidence of defendant's drug use. Instead, the prosecutor's remarks are better understood as emphasizing the court's instruction that the jury had to decide what the facts were based only on the evidence presented in the courtroom, which consisted of the sworn testimony of witnesses, admitted exhibits, and anything else the judge told them to consider as evidence. "A [criminal] jury may only decide the issue of guilt based on the evidence presented at trial, with the presumption of innocence as its starting point." (*Centeno, supra*, 60 Cal.4th at p. 669.) While jurors may rely on common knowledge

and experience when considering the evidence, "they may not go beyond the record to *supply* facts that have not been proved." (*Id.* at pp. 669-670.)

The prosecutor's fleeting comment in an otherwise lengthy closing argument, moreover, did not, as defendant contends, tell the jury that it could not rely on circumstantial evidence. Again, the prosecutor expressly acknowledged the circumstantial nature of the case and directly engaged with the circumstantial evidence of defendant's drug use, arguing that the evidence presented was simply insufficient to show he lacked the requisite specific intent the day of the murder to support a voluntary intoxication defense, because the totality of his actions showed a degree of cognizance after the killing that was inconsistent with the level of voluntary intoxication necessary to negate the required specific intent. (Cf. *People v. Peoples* (2016) 62 Cal.4th 718, 798 [prosecutor directly addressed the defense expert's testimony by arguing that defendant's alteration of the gun between shootings revealed the defendant's clarity of thought and that defense experts did not present more comprehensive testing because it would reveal that there was nothing wrong with defendant].)

But even if the jury could have misconstrued the prosecutor's remarks, any potential error was harmless. The trial court instructed the jury that the attorneys' closing statements were not evidence and that if anything the attorney said conflicted with the court's instructions, the jury must follow the instructions.

Regarding circumstantial evidence, the court instructed the jury that "[f]acts may be proved by direct or circumstantial evidence or by a combination of both," and that both direct and circumstantial evidence were "acceptable types of evidence to prove or disprove the elements of a charge, including intent and mental state and acts necessary to a conviction, and neither is necessarily more reliable than the other." The court further instructed that circumstantial evidence, or indirect evidence, does not directly prove a fact to be decided but is evidence of another fact or group of facts from which the jury could

13

logically and reasonably conclude the truth of the fact in question, including a defendant's mental state.

Regarding voluntary intoxication, the court instructed the jury that it could consider evidence of voluntary intoxication when determining whether defendant acted with the specific intent to kill and with premeditation and deliberation. For purposes of an intoxication defense, the jury was instructed that "[a] person is voluntarily intoxicated if he becomes intoxicated by willingly using any intoxicating drug, drink or other substance, knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect."

We presume the jurors followed these instructions (*People v. Smith* (2007) 40 Cal.4th 483, 517), and no evidence suggests otherwise. (*People v. Stitely* (2005) 35 Cal.4th 514, 559 [reviewing court "assume[d] the jury abided by the court's admonitions and instructions, and thereby avoided any prejudice"].) "When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for '[w]e presume that jurors treat the court's instructions as a statement of law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' " (*People v. Osband* (1996) 13 Cal.4th 622, 717.) The prosecutor herself encouraged the jury to follow the court's instructions during deliberations and expressly noted that nothing she said during closing was evidence. "Accordingly, it is not 'reasonably probable that a result more favorable to [the defendant] would have been reached in the absence of the error.' " (*People v. Peoples, supra*, 62 Cal.4th at p. 799.) The jury properly considered and rejected defendant's voluntary intoxication defense.

B.    *Custody Credits*

The court awarded defendant 552 days of presentence custody credit. The parties agree, as do we, that defendant is entitled to one additional day of credit for the actual day of sentencing.

14

A defendant convicted of a felony is entitled to credit for all days of presentence custody up to and including the day of sentencing. (§ 2900.5, subd. (a).) This is because "[a] defendant who remains in custody between conviction and sentencing will have spent part of the day of sentencing in custody prior to actual sentencing," and the sentencing court is obligated to award presentence credit for this partial day. (*People v. Smith* (1989) 211 Cal.App.3d 523, 526.)

In this case, defendant was arrested on October 20, 2020, and was sentenced on April 25, 2022. Defendant was therefore in actual custody for 553 days, including the day he was sentenced. Accordingly, we shall modify the judgment to award defendant 553 days of total credit and direct that the abstract of judgment be corrected to reflect that amount.

### III. DISPOSITION

The judgment is modified to award defendant one additional day of custody credit for a total of 553 days of credit. As so modified, the judgment is affirmed. The clerk of the trial court is directed to amend the abstract of judgment to reflect 553 days of credit and to forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

/S/

RENNER, J.

We concur:

/S/

HULL, Acting P. J.

/S/

MAURO, J.

15